SIGRID V. GREEN,                    )
                                    )
            Plaintiff,              )
                                    )
        v.                          )        No. 4:07 CV 1537 DDN
                                    )
 AT&T, INC., and                    )
FIDELITY EMPLOYER SERVICES CO.,     )
L.L.C.,                             )
                                    )
            Defendants.             )


## MEMORANDUM

This action is before the court on the motion of plaintiff, Sigrid
V. Green, for summary judgment (Doc. 55), and the motion of defendants,
AT&T, Inc. and Fidelity Employer Services Co., L.L.C. (Fidelity), for
summary judgment (Doc. 47).  Green also moves for sanctions.  (Doc. 53.)
The parties have consented to the exercise of plenary authority by the
undersigned United States Magistrate Judge pursuant to 28 U.S.C.
§ 636(c).  (Doc. 29.)  The court held a hearing on April 8, 2009.


## I.  BACKGROUND

Plaintiff, Sigrid Green, brought this ERISA action against AT&T and
Fidelity to recover a portion of her ex-husband's pension.  (Doc. 21.)

According to the amended complaint, Green and her husband were
married on July 7, 2001, and were divorced on September 15, 2005.  (Doc.
21 at ¶ 7.)  Green alleges that under the terms of the dissolution
judgment, entered by the St. Louis County Circuit Court, she was awarded
79.1% of the marital portion of her ex-husband's pension account, or
$43.421.15 (79.1% of $54,894).  (Id. at ¶¶ 5-7.)  Green alleges that the
circuit court entered a Domestic Relations Order (DRO), which
memorializes this judgment.[1]  (Id. at ¶ 7.)

---

[1]A circuit court issues a Domestic Relations Order.  The DRO only
becomes a Qualified Domestic Relations Order (QDRO) after it has been
approved by the Plan Administrator or a court of competent jurisdiction.
29 U.S.C. § 1056(d)(3)(B)-(D), (H).

According to the amended complaint, the DRO was sent to the defendants on March 27, 2006. (Id. at ¶ 8.) Green alleges that despite submitting the DRO, the defendants have repeatedly stymied her efforts to collect the amount due under the DRO. (See id. at ¶¶ 12-20.) In particular, she alleges the defendants told her they were unable to process her request, gave her conflicting information about the amount to which she was entitled, and advised her to obtain an amended DRO. (Id. at ¶¶ 12, 15-16.)

According to the amended complaint, Green obtained a second amended DRO from the circuit court on July 9, 2007. (Id. at ¶ 17.) Green alleges the second amended DRO provided that she was entitled to 68.3% of the marital portion of her ex-husband's pension account, or $55,448.98 (68.3% of $81,184.46). (Id.) Green alleges that despite submitting the second amended DRO, the defendants have repeatedly told her the award cannot be approved as a QDRO. (Id. at ¶ 19.) She further alleges that AT&T and Fidelity repeatedly failed to provide her with a copy of the Summary Plan Description (SPD). (Id. at ¶ 20.)

In Count I of the amended complaint, Green alleges the defendants did not provide her with a copy of the SPD until fifteen months after the date of her request. (Id. at ¶ 24.) Citing 29 U.S.C. § 1132(c), Green seeks statutory damages of $100 a day, for every day the defendants failed to provide her with the SPD, excluding the initial thirty day allowance. (Id. at 4-6.) In Count II of the amended complaint, Green alleges the defendants have failed to comply with the ERISA statute, and seeks a distribution of $55,448.98 from the pension plan. (Id. at 6-9.)

## II. STATEMENT OF UNDISPUTED FACTS

The record before the court indicates that the following facts are not disputed. Richard and Sigrid Green were married on July 7, 2001. (Doc. 57, Ex. 1 at 2). On September 15, 2005, the marriage was dissolved by a dissolution order of the St. Louis County Circuit Court. (Id. at 4.) During the marriage, Richard Green was an employee of what

is now AT&T Services, Inc., an affiliate of AT&T, Inc.[2]  (Doc. 49 at ¶ 2.)  As an employee of AT&T Services, he participated in the company's Pension Benefit Plan.  (See Doc. 58, Ex. 2.)  Richard's ex-wife, Sigrid, was a beneficiary under the plan.  (Doc. 49 at ¶ 5.)

During the marriage dissolution proceeding, plaintiff Green presented the trial court with an account summary of her husband's pension.  (Doc. 58, Ex. 2.)  According to the account statement, the value of the pension was $189,665.28 as of December 31, 2001, and $248,975.11 as of March 2, 2005.  (Id.)  Richard Green's pension plan was in the form of a cash balance account.  (Id.)

In its dissolution order, the court ordered that "the SBC pension account shall be divided by QDRO such that Husband shall receive 20.9% of the account and Wife shall receive 79.1% of that account."  (Doc. 57, Ex. 1 at 4.)  In schedule A, the court noted that the SBC Pension Benefit Program was the separate property of the husband for the amounts accrued before July 7, 2001 (the date of the marriage).  The court valued the pension at $189,665, as of July 7, 2001.  (Id. at 6.)  In schedule B, the Court noted that the equity value of the marital portion of the SBC Pension account was $54,894.[3]  (Id. at 7.)  Applying the percentages, the court's award would be $11,483 to the Richard Green, and $43,411 to Sigrid Green.[4]  (Id.)

_____

[2]Sometime during the marriage, AT&T merged with SBC, so that SBC Services, Inc. became AT&T Services, Inc., and the SBC Pension Benefit Plan became the AT&T Pension Benefit Plan.  (Doc. 49 at ¶¶ 2-3; Doc. 55 at ¶ 7.)  According to Hannah Patterson, the Director of Retirement Operations at AT&T, the merger has had no effect on the benefits owed Sigrid Green.  (Doc. 47, Ex. B at ¶ 16.)

[3]The circuit court seems to have arrived at this number by calculating the difference between the pension's value on March 2, 2005, and its value on December 31, 2001, and then subtracting the values of the SBC PAYSOP ($3,095) and the SBC 401(k) account ($1,309).  (See Doc. 57, Ex. 1 at 6) ($248,975.11 - $189,665.28 - $3,095 - $1,309 = $54,905.83).

[4]The circuit court appears to have made another small mathematical mistake in reaching these figures.  Based on the percentages, the amounts to the husband and wife should be $11,473 and $43,421, respectively ($54,894 x .791 = $43,421.15).

On January 26, 2006, the circuit court issued the DRO. (Doc. 59, Ex. 3.) The DRO noted that Richard Green was the participant, Sigrid Green was the alternate payee, and the relevant pension was the SBC Pension Benefit Plan. (Id. at ¶ 1(a)-(c).) The DRO ordered the plan administrator to pay directly to Green, "79.1% of the marital portion of the benefits payable to the Participant from the Plan." (Id. at ¶ 1(d).) The marital portion was the portion of the benefits that accrued from July 7, 2001, to September 15, 2005. (Id.) SBC was to pay Green her portion of the pension on her ex-husband's normal retirement date (even if he was not retired), or when her ex-husband elected to begin receiving benefits - whichever event happened first. (Id. at ¶ 1(f).) If the plan administrator determined that the court's order did not qualify as a DRO, Green was still entitled to "recover from the Participant, any amounts which should have been paid to [her under the court's order]." (Id. at ¶ 3(b).)

On March 27, 2006, the SBC QDRO Processing Group wrote Green, informing her that the Group had received the court's order of January 26, 2006, and that the order constituted a QDRO. (Doc. 60, Ex. 4.) The letter added that Green could elect to receive her portion of the pension "on or after the date on which the Plan Participant attains earliest retirement age." (Id.) She could not receive "a share of early retirement subsidy" under the QDRO. (Id.)

On April 5, 2006, Green wrote Fidelity Investments, asking to be paid, in a lump sum, her portion of her ex-husband's pension. (Doc. 61, Ex. 5.) She did not wish to be paid over a lifetime. (Id.)

On June 13, 2006, Green wrote to the Plan Administrator for the AT&T QDRO Processing Group. (Doc. 62, Ex. 6.) In her letter, Green again requested immediate access to her portion of the pension award. (Id.) That same day, Green sent an e-mail to Fidelity, expressing her frustration at not having received, what she called, her "QUADRO calculations" and "calculation kit." (Doc. 63, Ex. 7.)

According to Hannah Patterson, Fidelity is one of AT&T's vendors. (Doc. 47, Ex. B at ¶ 3.) As a vendor, Patterson contends that Fidelity does not exercise any discretion over the AT&T pension plan; it merely performs ministerial functions with respect to the plan. (Id. at ¶ 4.)

In fact, the agreement between Fidelity and SBC Communications, Inc. for pension plan administration services states, in relevant part,

> **3.21 Fiduciary Duty**
> It is the intention of the parties that Fidelity, as an independent contractor, shall perform the Services in accordance with the directions provided by SBC <u>and not as a Plan fiduciary</u> (within the meaning of Section 3(21) of ERISA). . . . [T]o the extent that Fidelity does in fact exercise any discretionary authority with respect to Plan administration that would cause it to be treated as a fiduciary within the meaning of Section 3(21) of ERISA, Fidelity shall comply with all applicable fiduciary standards of ERISA.

(Doc. 47, Ex. A at 4) (emphasis added). More to the point, the AT&T Management Pension Plan specifically states that "AT&T shall be the plan 'administrator' and the 'plan sponsor' of the Plan as those terms are defined in ERISA." (Doc. 47, Ex. D1 at 22.)

On September 20, 2006, Fidelity wrote to Green, notifying her that she was entitled to a single life annuity, paid monthly, in the amount of $25.95, or a one-time, lump sum payment of $6,225.76. (Doc. 64, Ex. 8.) Expecting an award in excess of $45,000, Green was confused by the lump sum offer of $6,225. (<u>See</u> Doc. 65, Ex. 9.) On October 2, 2006, Green's attorney, Deborah Benoit, sent AT&T and Fidelity a letter explaining her client's confusion. (<u>Id.</u>) On January 24, 2007, Fidelity sent Green a letter, calculating her one-time, lump sum payment to be $6,121.45. (Doc. 66, Ex. 10.) On February 21, 2007, Fidelity sent Green another letter, this time notifying her she was entitled to a single life annuity, paid monthly, in the amount of $157.29, or a one-time, lump sum payment of $37,099.71. (Doc. 68, Ex. 12.) A few days later, Fidelity calculated the lump sum payment to be $38,608.77. (Doc. 69, Ex. 13.) On March 14, 2007, another letter from Fidelity confirmed this amount.[5] (Doc. 70, Ex. 14.)

---

[5]Fidelity arrived at this amount by valuing the pension at $254,621.80 and $208,928.78 on the respective dates, taking the difference between those two values, adding interest, and multiplying by 79.1%. (Doc. 70, Ex. 14.)

On March 22, 2007, Benoit wrote to the legal department at AT&T. (Doc. 71, Ex. 15.)  Based on new calculations, Benoit believed the marital portion of the pension was $86,831.15.[6]  (<u>Id.</u>)  On April 12, 2007, AT&T responded, noting that it calculated the amount due Green to still be $38,608.77.  (Doc. 72, Ex. 16.)  But regardless of the discrepancy, AT&T stated that Green was "not entitled to an immediate payment" under ¶ 1(f) of the QDRO, since her ex-husband had not yet retired, and because his normal retirement date was not until March 2021.  (<u>Id.</u>)

On June 26, 2007, the circuit court issued a judgment, recalculating the marital portion of the pension by using values associated with dates closer to the exact dates of the marriage and its dissolution.  (Doc. 73, Ex. 17 at 1.)  On July 9, 2007, the circuit court issued a second amended DRO.  (<u>Id.</u> at 2.)  Under the terms of the second amended DRO, the court valued the pension at $167,790.65, as of July 7, 2001, and $248,975.11, as of September 15, 2005.  (<u>Id.</u> at ¶ 1(d).)  To compensate for the larger "marital portion," the circuit court reduced Green's share of the marital portion of the pension to 68.3%.  (<u>Id.</u> at 1, ¶ 1(d).)  The circuit court did not, however, indicate whether it was subtracting the values of the SBC PAYSOP and the SBC 401(k) account.  (<u>See id.</u> at ¶ 1(d).)  The circuit court also failed to explicitly state the exact amount of the marital portion and the exact amount to be awarded to Green.[7]  (<u>See id.</u>)  Like the original QDRO, this order provided that payment was to be made on her ex-husband's normal retirement date (even if he was not retired), or when her ex-husband elected to begin receiving benefits - whichever event happened first.  (<u>Id.</u> at ¶ 1(f).)  If the plan administrator determined

_____

[6]Benoit arrived at this new amount by calculating the difference in the value of Richard Green's pension on July 7, 2001, and September 15, 2005.  (Doc. 71, Ex. 15) ($254,621.80 - $167,790.65 = $86,831.15).  The previous marital portion had been calculated using less precise dates.  (<u>See</u> Doc. 58, Ex. 2.)

[7]Assuming no other necessary calculations, Green would be entitled to $55,448.98. (Doc. 73, Ex. 17 at ¶ 1(d)) ($248,975.11 - $167,790.65 = $81,184.46 x .683 = $55,448.98).  However, the defendants dispute that the marital portion is the difference between the plaintiff's two pension values.  (Doc. 48 at 18-19; Doc. 89 at ¶ 18; Doc. 90 at 13-14.)

that the court's order did not qualify as a QDRO, Green was still entitled to "recover from the Participant, any amounts which should have been paid to [her under the court's order]." (Id. at ¶ 3(b).)

On August 29, 2007, Green filed this suit against the defendants. (Doc. 1.) That same day, she wrote to Fidelity to appeal the company's decision denying her a portion of the benefits award, and to request "an immediate lump sum payout of benefits under the plan and all benefits due to me under the plan." (Doc. 75, Ex. 19 at 2.) Her letter also included a timeline of relevant events and conversations with the defendants' employees. (Id. at 2-5.)

On September 12, 2007, Fidelity notified Green that the company had rejected the second amended DRO, dated July 9, 2007, as not qualified, and that the original QDRO remained in effect. (Doc. 47, Ex. E; Doc. 74, Ex. 18.) Among the second amended DRO's shortcomings, it did not list the proper plan name, it did not clearly define the duration of the payment to Green, it did not provide a clear and calculable award, and it did not clearly state the portion of the pre-retirement survivor annuity assigned to Green. (Doc. 74, Ex. 18 at 1-2.) A document titled, "QDRO Approval Guidelines and Procedures for AT&T Pension Benefit Plan," specifies that the alternate payee's award must be clear and calculable. (Doc. 47, Ex. J at 17.) Under those guidelines, if the "benefit information required to exactly calculate the award cannot be determined, the Order will be **non-qualified**." (Id.)

On September 17, 2007, Green requested from Fidelity a copy of the "AT&T Pension Benefit Summary Plan Description as well as the SBC Pension Benefit Summary Plan Description immediately." (Doc. 77, Ex. 21.) In her fax, Green noted that she had "asked for a copy of this several times." (Id.) Green received a copy of the SPD for the pension plan at the end of September 2007. (Doc. 55 at ¶ 22; Doc. 56 at ¶ 28; Doc. 77, Ex. 22.) According to Hannah Patterson, there is no record of Green requesting an SPD at an earlier time. (Doc. 47, Ex. B at ¶ 8.)

In October 2007, Benoit prepared a draft for a third amended DRO, hoping to cure some of the problems Fidelity had identified. (Doc. 55 at ¶ 23; Doc. 82, Ex. 23.) Benoit submitted the draft order to Fidelity, but the company rejected it on October 25, 2007. (Doc. 47,

Ex. H; Doc. 83, Ex. 24.)  Fidelity identified nine specific problems with the proposed draft, including the fact that the new draft still "fail[ed] to provide a clear and calculable award." (Doc. 83, Ex. 24 at 1.)  In particular, Fidelity advised Benoit "to state clearly the Alternate Payee's award as a <u>fraction, a percentage OR a specific dollar amount</u> of the Participant's vested accrued benefit at a specified date or accrued between two dates, in accordance with the Parties' intent." (<u>Id.</u>)  On November 26, 2007, Fidelity denied Green's  request for an immediate, lump sum payment of her benefits.  (Doc. 84, Ex. 25.) Fidelity explained that the provisions of the QDRO and the pension plan did not allow for an immediate payment.[8]  (<u>Id.</u> at 2.)

In November 2008, during the course of discovery, the defendants provided Green with a summary of the material modifications (SMM) to the company's pension plan.  (Doc. 56 at ¶ 31; Doc. 85, Ex. 26.)  According to the SMM, the SBC Pension Benefit Plan provided an alternate payee the largest of three types of benefits: (1) a cash balance account; (2) an updated career average minimum benefit; and (3) other benefits.  (Doc. 85, Ex. 26 at 3.)

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Citrate</u>, 477 U.S. 317, 322 (1986); <u>Devin v. Schwan's Home Serv., Inc.</u>, 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the

---

[8]According to the defendants, in October 2008, AT&T and Fidelity began working with Green's lawyer to develop a draft for a fourth DRO that would satisfy the ERISA requirements and that would provide Green an immediate lump sum distribution of $55,448.99.  (Doc. 48 at 22-23.) According to the defendants, Fidelity will accept the draft of this fourth DRO.  (<u>Id.</u>)  But, according to the defendants, Green has neglected to submit the draft DRO to the circuit court for approval. (<u>Id.</u>)  "All the Plaintiff needs to do to obtain the lump sum requested is to submit the Fourth Draft DRO to the Circuit Court of St. Louis County, have the judge sign it, and submit the signed DRO to the QDRO Processing Unit, and she will be provided her $55,449.98. . . ." (<u>Id.</u> at 26.)

nonmoving party and accord it the benefit of all reasonable inferences. _Devin_, 491 F.3d at 785. A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable verdict in favor of the non-moving party. _Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co._, 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial. _Celotex_, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); _Howard v. Columbia Pub. Sch. Dist._, 363 F.3d 797, 800 (8th Cir. 2004); _Krein v. DBA Corp._, 327 F.3d 723, 726 (8th Cir. 2003).


## IV. DISCUSSION

In their motion for summary judgment, AT&T and Fidelity argue that there are no genuine issues of material fact. In response to Count I, the defendants argue that Green never submitted a clear, written request for an SPD before September 2007. In response to Count II, the defendants argue the plain language of both the initial, accepted QDRO and the second, rejected DRO prevented them from providing Green with an immediate disbursement. The defendants also maintain that they properly rejected the second DRO. (Doc. 48; Doc. 90.)

In her motion for summary judgment, Green also argues that there are no genuine issues of material fact. (Doc. 86; Doc. 88.) In support of Count I, she argues that her letter to Fidelity in June 2006 was sufficiently specific to trigger the statutory penalties found in ERISA. In support of Count II, Green argues that both the initial QDRO and the second amended DRO allowed for an immediate disbursement, and that the defendants wrongfully withheld payment. She also argues that the second DRO satisfied all the ERISA requirements, and that the defendants wrongfully rejected it. Finally, Green notes that the defendants provided her with conflicting and misleading information about the amounts to which she was entitled. (Doc. 86; Doc. 88.)

**COUNT I**

There are three forms of disclosure for documents covered by the ERISA statute. 29 C.F.R. § 2520.104b-1(a). The first form of disclosure concerns documents that the plan administrator must, by direct operation of law, provide to all "participants covered under the plan and <u>beneficiaries receiving benefits</u> under the plan," at stated times or when certain events occur. <u>Id.</u> (emphasis added). The second form of disclosure concerns documents that the plan administrator must provide to individual participants and beneficiaries upon their request. <u>Id.</u> The third form of disclosure concerns documents that the plan administrator must make available to participants and beneficiaries for inspection. <u>Id.</u>

In this case, Green is a beneficiary who is not yet receiving benefits. As a result, the defendants were only obligated to provide her with certain plan documents upon request; there were no mandatory disclosure requirements. <u>See id.</u>

**Summary Plan Description (SPD) Request**

Green argues the defendants failed to provide her with a copy of the SPD for fifteen months. A plan administrator must provide participants and beneficiaries of the plan a copy of the SPD and the annual reports under certain conditions. 29 U.S.C. § 1022; 29 U.S.C. § 1024(b). If the beneficiary is receiving benefits, the plan administrator must provide her a copy of the SPD within ninety days of her first receipt of benefits. 29 U.S.C. § 1024(b)(1). If the beneficiary is not yet receiving benefits, as in this case, she must affirmatively request, in writing, a copy of the SPD. 29 U.S.C. § 1024(b)(4).

Once the beneficiary submits a written request, the plan administrator must provide her with a copy of the latest, updated SPD, "the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or [any] other instruments under which the plan is established or operated." <u>Id.</u> The plan administrator must comply with this request within thirty days of the demand. 29 U.S.C. § 1132(c)(1)(B). The administrator satisfies its statutory

obligations by mailing the requested materials to the beneficiary's last known address. <u>Id.</u> If the administrator fails to satisfy its statutory obligations, it faces penalties of up to $110 a day, for every day, after the thirty days, in which it is non-compliant. <u>Id.</u>; 29 C.F.R. § 2575.502c-1; <u>Christensen v. Qwest Pension Plan</u>, 462 F.3d 913, 919 n.3 (8th Cir. 2006). The decision whether to assess the penalty, and in what amount, is left to the discretion of the district court. 29 U.S.C. § 1132(c)(1)(B); <u>Bartling v. Fruehauf Corp.</u>, 29 F.3d 1062, 1068 (6th Cir. 1994); <u>see also</u> <u>Fishman v. Zurich Am. Ins. Co.</u>, 539 F. Supp. 2d 1036, 1049 (N.D. Ill. 2008) (awarding penalties of $11 a day under § 1132(c)).

The purpose of § 1132(c)(1)(B) is to induce plan administrators to provide participants and beneficiaries with the requested plan documents in a timely fashion by providing penalties for the failure to so. <u>Bartling</u>, 29 F.3d at 1068. But before applying the statute's penalty provision, the court must be sure that "the words of the statute plainly impose it." <u>Christensen</u>, 462 F.3d at 919. After all, statutory penalty provisions must be strictly construed. <u>Fisher v. Metro. Life Ins. Co.</u>, 895 F.2d 1073, 1077 (5th Cir. 1990); <u>Serpa v. SBC Telecomms., Inc.</u>, No. C03-4223 MHP, 2004 WL 3204008, at *3 (N.D. Cal. Dec. 8, 2004).

To satisfy § 1024(b)(4), the beneficiary must prove that (1) she requested the plan documents in writing, (2) her request was clear and specific, and (3) the plan administrator failed to provide the requested documents. <u>Kerr v. Charles F. Vatterott & Co.</u>, 184 F.3d 938, 947-48 (8th Cir. 1999); <u>Brooks v. Metrica, Inc.</u>, 1 F.Supp.2d 559, 567 (E.D. Va. 1998); <u>see also</u> <u>Anderson v. Flexel, Inc.</u>, 47 F.3d 243, 248 (7th Cir. 1995) ("A request for documents under § 1024(b)(4) necessitates a response from the plan administrator when it gives the administrator clear notice of what information the beneficiary desires.").

Determining when a request is sufficiently clear is a fact-specific inquiry. <u>See e.g.</u>, <u>Anderson</u>, 47 F.3d at 248; <u>Bartling</u>, 29 F.3d at 1070-71; <u>Fisher</u>, 895 F.2d at 1077. In fact, an administrator's particular awareness of surrounding circumstances or of the information being requested may transform an otherwise general request into a request that satisfies ERISA's clarity requirements. <u>Anderson</u>, 47 F.3d at 248. To

that end, courts have inquired whether the plan administrator "knew or should have known" that the beneficiary's request related to a plan document covered by the statute. <u>Bartling</u>, 29 F.3d at 1070; <u>Fisher</u>, 895 F.2d at 1077. The beneficiary does not even have to ask for the document by name; a clear description of the plan document can be sufficient to trigger the penalty provisions. <u>Bartling</u>, 29 F.3d at 1071; <u>Brooks</u>, 1 F.Supp.2d at 567-68.

Examining these cases, and others, reveals just how fact-specific the inquiry can be. In some cases, the courts have found the plaintiff's request insufficient to meet the requirements of § 1024(b)(4). <u>See</u> <u>Fisher</u>, 895 F.2d at 1077 (finding the plaintiff's request for "a copy of the policies covering my contract for salary continuation," was not a request for the SPD); <u>Wesley v. Monsanto Co.</u>, 710 F.2d 490, 491 (8th Cir. 1983) (per curiam) (affirming the district court's decision, which found that the plaintiff's request for copies of his employer's "insurance policy" and "medical benefits plan" was not a request for the company's disability plan); <u>Serpa</u>, 2004 WL 3204008, at *4 (finding the plaintiff's request for "all employment, pension, and Qualified Domestic Relation Order (QDRO) documents relating directly or indirectly to Ms. Serpa's election to retire from SBC on or about November 15, 2000," was not a clear, written request for § 1024(b)(4) documents, but rather a general request, typical of "informal, pre-litigation discovery."); <u>Colin v. Marconi Commerce Sys. Employees' Ret. Plan</u>, 335 F. Supp. 2d 590, 611 (M.D.N.C. 2004) (finding the plaintiff's request for "documents used to calculate his 'final monthly compensation,'" did not give rise to a cause of action); <u>Draper v. Baker Hughes, Inc.</u>, 892 F. Supp. 1287, 1299 (E.D. Cal. 1995) (finding the plaintiff's request to "see the <u>actual Plan provisions</u> which purport to authorize the switch in computation of insurance premiums when an individual elects COBRA coverage" was not a request for the SPD).

In other cases, though, the courts have found the plaintiff's request sufficient to meet the requirements of § 1024(b)(4). <u>See</u> <u>Brown v. Aventis Pharm., Inc.</u>, 341 F.3d 822, 826 (8th Cir. 2003) (affirming the district court's finding that the plaintiff's request for "'notice of termination of any of [my] other benefits'" constituted a request for

the SPD and merited sanctions); <u>Bartling</u>, 29 F.3d at 1070-71 (finding that defendants "knew or should have known" that the plaintiff's request for "worksheets" included calculation procedures falling under § 1024(b)(4), and remanding for consideration of the proper penalties); <u>McElyea v. AIG Life Ins. Co.</u>, 326 F.Supp. 2d 960, 968-69 (E.D. Ark. 2004) (finding the plaintiff's request for "all of the Plan's formal legal documents, including the summary of benefits" satisfied § 1024(b)(4) and merited sanctions); <u>Brooks</u>, 1 F. Supp. 2d at 567-68 (finding the plaintiff's request for "a copy of your plan documents describing the procedures [I] must follow in pursuing [my] complaint" satisfied § 1024(b)(4) and merited sanctions); <u>but see</u> <u>Thorn v. Northside Hosp.</u>, No. 1:07 CV 155, 2008 WL 2600791, at *7-*9 (W.D. Mich. June 24, 2008) (finding the plaintiff's request for a "policy book" and a "policy booklet for the life insurance policy" presented a genuine issue of fact on the appropriateness of § 1132(c)(1) sanctions).

In this case, Green argues the defendants failed to send her a copy of the SPD for close to fifteen months. On June 13, 2006, Green sent Fidelity an e-mail, requesting "QUADRO calculations" and a "calculation kit." (Doc. 63, Ex. 7.) This e-mail followed Green's attempts to gain immediate access to her portion of her ex-husband's pension, but preceded the confusion about the exact amount to which Green was entitled, and preceded the circuit court issuing its amended DRO. On September 17, 2007, Green requested from Fidelity "a copy of the Summary Plan Description." (Doc. 77, Ex. 21.) These are the only two written requests Green discusses in her memorandum. (Doc. 86 at 5.)

Considering both the timing and circumstances surrounding the e-mail, it seems clear that the June 2006 request does not satisfy the requirements of § 1024(b)(4). The wording of the request lacks both specificity and clarity, and there is no indication the defendants knew or should have known that the e-mail was requesting the SPD. Indeed, when Green wanted a copy of the SPD, her request was worded in no uncertain terms: "I am requesting a copy of the Summary Plan Description," she wrote on September 17, 2007. (Doc. 77, Ex. 21.) The June 2006 request does not satisfy § 1024(b)(4), and therefore, does not give rise to a cause of action. <u>See</u> <u>Colin</u>, 335 F. Supp. 2d at 611 n.25.

**Summary of Material Modifications (SMM) Request**

Green also argues the defendants failed to provide her with a copy of the SMM for the period from September 2007 to November 2008. A plan administrator must provide each participant and beneficiary receiving benefits under the plan a copy of a "summary of any material modification in the terms of the plan. . . ." 29 U.S.C. § 1024(b)(1); 29 U.S.C. § 1022(a). As noted above, Green is not a beneficiary receiving benefits under the plan. As a result, the defendants were only obligated to provide Green with a copy of the SMM upon request; there were no mandatory disclosure requirements. See 29 U.S.C. § 1024(b)(1); 29 U.S.C. § 1024(b)(4); 29 C.F.R. § 2520.104b-1(a).

In September 2007, Green requested a "copy of the Summary Plan Description." This request did not mention, or make any reference to, the SMM. The cardinal question, therefore, is whether a request for an SPD includes within it a request for the SMM. The answer is that it does not.

Since Green is a beneficiary not yet receiving benefits, her requests for information fall under § 1024(b)(4) and not § 1024(b)(1). See 29 U.S.C. § 1024(b)(4); 29 U.S.C. § 1024(b)(1); 29 C.F.R. § 2520.104b-1(a). Under § 1024(b)(4), the plan administrator shall, upon written request, provide any participant or beneficiary a copy "of the latest updated summary plan description . . . or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).

An SMM is a document designed to report changes in the ERISA plan and, along with annual reports and SPDs, to keep participants notified of their rights and benefits. Ward v. Maloney, 386 F. Supp. 2d 607, 611 (M.D.N.C. 2005), aff'd, 171 F. App'x 986 (4th Cir. 2006) (per curiam). As such, an SMM is clearly a document "under which the plan is established or operated," and subject to a § 1024(b)(4) request. Id. But since a request for an SMM falls under the "other instruments" clause of § 1024(b)(4), rather than the "latest updated summary plan description" clause, it follows that a request for an SMM is not part of a request for an SPD. See id. In other words, the Ward court did

- 14 -

not find that a request for an SMM was subsumed within the SPD language. See id.; see also Fishman, 539 F. Supp. 2d at 1048 (dividing the plaintiff's request for documents into three distinct categories: (1) a summary plan description, (2) a summary of material modifications, and (3) all "'relevant'" information relating to the denial of plaintiff's benefits).

In requests for documents, plaintiffs themselves have been careful to distinguish between requests for SMMs and requests for other plan documents. See Ward, 386 F. Supp. 2d at 611 (noting plaintiff requested "a copy of the **SUMMARY OF MATERIAL MODIFICATIONS**" in a letter to the defendant); Otero Carrasquillo v. Pharmacia, 382 F. Supp. 2d 300, 312 (D.P.R. 2005), aff'd, 466 F.3d 13 (1st Cir. 2006) (noting plaintiff "clearly requested the SMM and other relevant documents" under § 1024(b)(4), and should be awarded penalties under § 1132(c)(1)); McFaul v. Lowes Corp., No. 93 Civ. 2401 (KC), 1993 WL 541778, at *1 (S.D.N.Y. Dec. 30, 1993) (noting plaintiff requested "all summary of material modifications filed" in three-year period, along with SPDs, and other plan documents).

Looking to the cases cited above, there is no support for the theory that a request for an SPD acts as a request for an SMM. One section of the code of federal regulations appears to group a request for an SPD with an obligation to provide an SMM. 29 C.F.R. § 2520.104a-8(a)(1)(i). Under that section, the plan administrator must provide the Secretary of Labor, upon written request, a copy of the "latest updated summary plan description (including any summaries of material modifications to the plan. . . .)." Id. Because this section concerns disclosure to the Secretary of Labor, rather than disclosure to plan participants and beneficiaries, the court finds this section inapposite.

On September 17, 2007, Green requested a copy of the SPD. She received a copy of the SPD later that month, within the thirty-day statutory deadline. She never specifically requested an SMM. Under the case law, Green's failure to clearly request an SMM cannot support a cause of action under § 1024(b)(4).

In her brief and supporting memorandum, Green cites to 29 U.S.C. § 1104 and 29 U.S.C. § 1109. (Doc. 1 at ¶¶ 25-26; Doc. 86 at 5.) Since

the defendants did not violate the requirements of § 1024(b)(4), they did not violate any of the fiduciary duties under § 1104 and § 1109. More to the point, the "general fiduciary obligations set forth in ERISA § 404 [29 U.S.C. § 1104] do not refer to the disclosure of information to Plan participants, and it would be inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about such duties." <u>Weiss v. CIGNA Healthcare, Inc.</u>, 972 F.Supp. 748, 754 (S.D.N.Y. 1997).

Green is not entitled to any damages under § 1132(c)(1).[9] Summary judgment is appropriate on Count I.

**Count II**

In 1984, Congress passed the Retirement Equity Act (REA), to allow for the assignment of plan benefits to a former spouse or dependent by a state court order. 29 U.S.C. § 1056(d)(3); <u>Trustees of Dirs. Guild of America-Producer Pension Benefits Plan v. Tise</u>, 234 F.3d 415, 419 (9th Cir. 2000), <u>amended on denial of reh'g</u>, 255 F.3d 661 (9th Cir. 2000). In passing the REA, Congress specifically noted that a QDRO was an exception to the general prohibition on the assignment of pension plan proceeds. 29 U.S.C. § 1056(d)(3). A QDRO is a type of domestic relations order (DRO), which is any order that (1) relates to child support, alimony payments, or marital property rights, (2) involves a spouse, former spouse, child, or other dependant of a plan participant, and (3) is made pursuant to state domestic relations law. 29 U.S.C. § 1056(d)(3)(ii).

A DRO is a QDRO if it "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a[n ERISA] plan. . . ." 29 U.S.C. § 1056(d)(3)(B). A QDRO must also specify (1) the name and last known mailing address of

---

[9]Fidelity argues that it is not liable for damages because it is neither a fiduciary nor an administrator of the Plan, under ERISA. (Doc. 48 at 3.) Since Green is not entitled to damages under § 1132(c)(1), there is no need to resolve this issue. <u>Fisher</u>, 895 F.2d at 1077.

the alternate payee and the plan participant, (2) the amount or percentage of plan benefits to be paid by the plan to the alternate payee, or the method for determining such an amount or percentage, (3) the number of payments or time period governed by the order, and (4) the plan to which the order applies. 29 U.S.C. § 1056(d)(3)(C). At the same time, a valid QDRO cannot (1) require the plan to provide any type of benefit not otherwise provided by plan, (2) require the plan to provide increased benefits, and (3) require benefits to be paid to an alternate payee which must, in turn, be paid to another alternate payee. 29 U.S.C. § 1056(d)(3)(D). A DRO that "substantially complies" with these requirements is a QDRO. Tise, 234 F.3d at 420. Under ERISA, a former spouse is an alternate payee. 29 U.S.C. § 1056(d)(3)(K).

The primary responsibility for determining whether a DRO is a QDRO rests with the plan itself. 29 U.S.C. § 1056(d)(3)(G); Tise, 234 F.3d at 420. As a result, an alternate payee who has obtained a DRO from the state court must present that order to the plan administrator for the ultimate determination of whether it is a QDRO. Tise, 234 F.3d at 420. Once submitted, the plan administrator must notify the alternate payee of the status of the DRO within a reasonable period. 29 U.S.C. § 1056(d)(3)(G)(i). If the plan administrator determines that the DRO meets the criteria of a QDRO, then it must follow the provisions of the QDRO. Johnston v. Capital Accumulation Plan of Chubb Corp., No. 3:98 CV 2296-D, 2000 WL 1006935, at *3 (N.D. Tex. July 19, 2000). "Both ERISA and case law require a plan administrator to follow the dictates of the QDRO." Id.

The alternate payee may also petition a competent court to determine if the DRO is a QDRO. See 29 U.S.C. § 1056(d)(3)(H)(i). After all, the ERISA provisions "clearly contemplate that questions concerning the enforceability of DROs as QDROs can occur. . . ." Tise, 234 F.3d at 424. Federal courts interpret QDROs according to ordinary principles of contract law. See Galvan v. SBC Pension Benefit Plan, No. SA-04-CV-333-XR, 2007 WL 2892005, at *4 (W.D. Tex. Oct. 1, 2007), on reconsideration in part, 2008 WL 114927 (W.D. Tex. Jan. 10, 2008) (applying Missouri law); Johnston, 2000 WL 1006935, at *3.

Citing § 1056, Green argues the defendants wrongfully withheld immediate payment, and that the defendants wrongfully rejected the second DRO as unqualified. She also argues that these actions were a breach of the defendants' fiduciary obligations under § 1104.

On January 26, 2006, the circuit court issued its first DRO. The plain language of ¶ 1(f) of the DRO states that

> Payments to the Alternate Payee, as provided in subparagraph (d) above, shall be made whether or not he has retired, at the Participant's normal retirement date; provided, however, if the Participant retires and begins receiving benefits prior to his normal retirement date, the Alternate Payee's benefits will commence at the same time. In the event of the termination or partial termination of the Plan, the benefit payable to the Alternate Payee shall be payable as provided by the Plan.

(Doc. 59, Ex. 3 at ¶ 1(f).) On July 9, 2007, the circuit court issued its second amended DRO, which Fidelity rejected on September 12, 2007. The second amended DRO contains the exact same language in its ¶ 1(f). (Doc. 73, Ex. 17 at ¶ 1(f).) Green does not dispute that her ex-husband has not yet retired, or that his normal retirement date is several years away. (See Doc. 72, Ex. 16.)

Under Missouri law, the court may not alter the parties' agreements through interpretation. Pepsi Midamerica v. Harris, 232 S.W.3d 648, 654-55 (Mo. Ct. App. 2007). In interpreting a contract, the court's central obligation is to "ascertain the intention of the parties and to give effect to that intent." Id. To determine the intent of the parties, the terms of a contract are read as a whole, and given their plain, ordinary, and usual meaning. Id. Unless the contract is ambiguous, the intent of parties is determined based on the contract alone, and not on extrinsic evidence. Armstrong Bus. Servs., Inc. v. H & R Block, 96 S.W.3d 867, 874 (Mo. Ct. App. 2002). A contract is ambiguous if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain. Id. A contractual provision is not ambiguous just because the parties disagree over its meaning. Id.

Section 1(f) could not be clearer. Payment to Green shall be made on her ex-husband's normal retirement date, even if he has not retired, or when he elects to start receiving his benefits - whichever happens

first.  The plain language of the QDRO and the subsequent second amended DRO make no mention of an immediate payment – even though they could have been drafted to provide an immediate payment.  See D.K.H. v. L.R.G., 102 S.W.3d 93, 105 (Mo. Ct. App. 2003) (noting that the "domestic relations order entered by the [circuit] court . . . indicates that Wife's share 'shall be immediately payable in a lump-sum form of benefit or such other form as [Wife] elects as permitted under the Plan.'") (emphasis added); In re Marriage of Novak, 83 S.W.3d 597, 601 (Mo. Ct. App. 2002) (per curiam) (noting that the DRO entered by the circuit court specifically stated that the wife could immediately receive payments from the husband's pension plan, as part of her maintenance award).

Mindful that it must look to the plain and ordinary meaning of the DRO's language as though it was a contract, the court concludes that neither the first QDRO nor the second amended DRO provide for an immediate payment.  Since a plan administrator must follow the provisions of the QDRO, the defendants did not wrongfully withhold an immediate payment.  And since AT&T and Fidelity have no choice but "to follow the dictates of the QDRO," the defendants did not breach any of their fiduciary duties by failing to provide Green with an immediate disbursement.  See 29 U.S.C. § 1104.

In support of her argument, Green points to ¶ 1(e) of the DRO. Section 1(e) states that

> Benefits shall be paid to the Alternate Payee in any form in which benefits may be paid to the Participant under the Plan and shall continue as long as Participant or Alternate Payee are eligible to receive benefits under the Plan.

(Doc. 59, Ex. 3 at ¶ 1(e)) (emphasis added).  By its plain language, this section speaks only to the form of the payment; not the timing of the payment.  Indeed, reading a timing component into this section would create a conflict with ¶ 1(f), the very next section.  See Galvan, 2007 WL 2892005, at *5 ("In interpreting the QDRO, it is important to remember the disputed provisions must be read with reference to the whole.").  Reading the contract as a whole, ¶ 1(e) speaks to the form of the payment, while ¶ 1(f) speaks to the timing of the payment.  As

noted above, ¶ 1(f) did not authorize AT&T or Fidelity to provide an immediate payment to Green.

Green argues that the defendants wrongfully rejected the second amended DRO. Under the plain language of the ERISA statute, a DRO must clearly specify "each plan to which such order applies." 29 U.S.C. § 1056(d)(3)(C). The second amended DRO identified the pension plan as the SBC Pension Benefit Plan in Little Falls, New Jersey. (Doc. 73, Ex. 17 at ¶ 1(c).) By this time, the name of the pension plan was the AT&T Pension Benefit Plan. (Doc. 74, Ex. 18 at 1.) Because the second amended DRO identified the wrong plan, the defendants did not wrongfully reject it. See 29 U.S.C. § 1056(d)(3)(C); see generally Parham v. Parham, 855 N.E.2d 722, 725 (Ind. Ct. App. 2006) (noting the trial court issued a second DRO after the plan administrator rejected the first DRO because it did not include the full plan name); Baker v. Paluch, No. Civ. A. 22078, 2004-Ohio-6744, at ¶¶ 2-3 (Ohio Ct. App. 2004) (noting the trial court issued a second DRO after the plan administrator rejected the first DRO due to a "labeling mistake").

The defendants also rejected the second amended DRO because it failed to provide a clear and calculable award. For the benefit of the parties going forward, the court finds that the second amended DRO did provide a clear and calculable award. In its order, the circuit court noted that the pension values at the beginning and at the end of the marriage "[have] now been documented to be" $167,790.65 and $248,975.11, respectively. (Doc. 73, Ex. 17 at 1) (emphasis added). The order defined the marital portion as the difference between these two values. (Id. at ¶ 1(d).) Multiplying this difference by the wife's share of the marital portion of the pension, or 68.3%, produces a clear value of $55,448.98. See note 7. The second amended DRO clearly specified the "amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee. . . ." 29 U.S.C. § 1056(d)(3)(C)(ii) (emphasis added).

But even if the defendants did wrongfully reject the second amended DRO, that order still did not provide for an immediate disbursement. The second amended DRO contains the same exact language in ¶ 1(f) as the

first QDRO.  The second amended DRO therefore suffers from the same drafting problem identified above.

Finally, Green argues that the defendants provided her with conflicting and misleading information.  However, Green does not argue this was done deliberately or with an intent to harass or defraud.  Absent such proof, the defendants' conduct is not a breach of the fiduciary duty.  <u>See</u> <u>Christensen</u>, 462 F.3d at 918 (noting that two other circuits have upheld grants of summary judgment for ERISA fiduciaries accused of breaching the duty of care "by providing incorrect benefit projections or the wrong form for designating plan beneficiaries").

Under the plain language of ¶ 1(f), Green is not entitled to an immediate disbursement under either the initial QDRO or the second amended DRO.  The defendants did not wrongfully withhold payment, wrongfully reject the second amended DRO, or breach any fiduciary duties.  Summary judgment is appropriate on Count II.

**Motion for Sanctions**

On January 21, 2009, the court issued an order, compelling the defendants to provide Green with documents supporting their calculations of certain account values.  (Doc. 52.)  Green argues the defendants failed to provide the documents within the court-ordered time frame.  (Doc. 53.)

In response, the defendants note that the documents were produced on February 5, only four business days after the deadline.  The defendants also note that the delay stemmed from having to search through company archives, and that there was some difficulty reading the encrypted e-mail containing the documents.  (Doc. 54.)

Under the circumstances, the four-day delay was excusable.  The motion for sanctions is denied.

An appropriate order is issued herewith.


＿＿＿/S/ David D. Noce＿＿＿＿＿

UNITED STATES MAGISTRATE JUDGE

Signed on April 29, 2009.